IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MILDRED L. WEISBERG**, *INDIVIDUALLY AND AS EXECUTRIX OF ESTATE OF MORRIS L. WEISBERG,*<br><br>Plaintiff,<br><br>*v.*<br><br>**RICHARD C. WEISBERG,**<br><br>Defendant. | CIVIL ACTION<br><br>NO. 2:19-cv-3521-KSM |

## MEMORANDUM

**Marston, J.**                                                                                                               **July 16, 2020**

Plaintiff Mildred L. Weisberg brings this action against her son, Defendant Richard C. Weisberg, for breach of contract, breach of fiduciary duty, and other counts related to the purchase and sale of property located in Ardmore, Pennsylvania. Richard moves for leave to file an amended answer and third party complaint to add additional parties. For the reasons discussed below, his motion will be denied.

I.

This family dispute is about the property located at 149 Cricket Avenue, Ardmore, Pennsylvania, 19003. Mildred alleges that in 2012, she, Richard, and her deceased husband, Morris Weisberg, entered an agreement under which Richard would purchase the Cricket property and hold title on behalf of Morris and Mildred and for the benefit of his brother, John, who suffers from a disability. (Doc. No. 1 at p. 10, ¶ 15; *id.* at p. 11, ¶ 19.) In exchange, Mildred and Morris would reimburse Richard for expenses related to the purchase, renovation, and maintenance of the property. (*Id.* at p. 11, ¶ 19.) Mildred alleges that in total, she and

Morris paid Richard more than $290,000 as reimbursement for mortgage payments, property taxes, costs of renovations, and other expenses related to the property. (*Id.* at p. 15, ¶ 45.) After Morris passed away, Richard allegedly threatened to sell the property in violation of the agreement with his parents, forcing Mildred to purchase the property from him. (*Id.* at p. 15, ¶ 46; *id.* at p. 16, ¶ 57; *id.* at p. 17, ¶ 62; *id.* at p. 18, ¶ 65.)

Mildred filed this action on her own behalf and on behalf of Morris' Estate in the Montgomery County Court of Common Pleas on July 3, 2019. (Doc. No. 1, Ex. 1, pp. 6–28.) She alleges that Richard's actions amount to, among other things, breach of contract, breach of fiduciary duty, and conversion. (*Id.*) In August 2019, Richard removed the action to this Court on diversity grounds (Doc. No. 1), and after this Court denied his motion to dismiss (Doc. No. 2), Richard answered the complaint in February 2020 (Doc. No. 7). After an initial pretrial conference with the parties, the Court issued a scheduling order on March 17, 2020, which ordered that all "motions to amend the complaint and to join or add additional parties shall be filed no later than **March 31, 2020**." (Doc. No. 12 at ¶ 2.)

On May 18, 2020, after the deadline for adding additional parties had passed, Richard filed a Motion for Leave to File Amended Answer and Third Party Complaint to Add Parties. (Doc. No. 18.) He contends that "[b]ased on what has been determined during discovery, Richard now believes that it is necessary to add additional, third party defendants, James Weisberg (Richard's brother and Mildred's son) and Sheila O'Shaughnessy (James' wife and also the bookkeeper), to assert a claim for contribution or indemnification." (*Id.* at p. 3.) Richard alleges that James and Sheila mismanaged the bank account that Richard opened for the Cricket property and took money from the account for personal use. He argues that if "Mildred is entitled to receive some or all of the approximately $290,000 she alleges to have advanced for

the Property, some of those monies went directly to James Weisberg and his wife, Sheila O'Shaughnessy," and therefore, "Richard would have a claim for contribution and/or indemnification against James and Sheila for the monies that they took out of the Property."  (*Id.* at p. 4.)  Mildred opposes the motion, arguing that Richard has not shown good cause for missing the deadline in the Scheduling Order, and that even if he had, the amendment is futile, prejudicial, and the result of undue delay.  (*See generally* Doc. Nos. 19 & 23.)

II.

Generally a motion to file an amended pleading is governed by Federal Rule of Civil Procedure 15, which allows a party to "amend its pleading once as a matter of course within 21 days after serving it, or . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave," which should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This is a lenient standard, and "[i]n the absence of substantial or undue prejudice, denial [of a motion to amend] must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment."  *Heyl & Patterson Int'l, Inc. v. F. D. Rich Housing of Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir. 1981).  The burden is on the party opposing the amendment, and the "touchstone of the rule is a showing of prejudice" to the opposing party.  *Price v. Trans Union, LLC*, 737 F. Supp. 2d 276, 279 (E.D. Pa. 2010).

However, when a party seeks leave to amend a pleading or add parties after a deadline set by a court order, "the decision whether to allow the amendment is controlled by Rule 16(b)," which states that a scheduling order "may be modified only for good cause and with the judge's

3

consent." *Id.* Once the deadline in the scheduling order has passed "the party seeking the amendment is effectively asking the court not only for leave to amend its pleading, but also the scheduling order," which means that the "party's request now implicates the effective administration of justice." *Id.* Accordingly, the party must show "good cause in order to procure the court's consent." *Id.*; *see also Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 701 (E.D. Pa. 2007) (explaining that although the Third Circuit has not yet addressed the issue, seven other circuit courts have addressed the tension between Rule 15(a) and Rule 16(b) and found that "once the pretrial scheduling order's deadline for filing motions to amend the pleadings has passed, a party must, under Rule 16(b), demonstrate 'good cause' for its failure to comply with the scheduling order before the trial court can consider, under Rule 15(a), the party's motion to amend its pleading"); *cf. E. Minerals & Chem. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000) (affirming district court order denying motion to amend under Rule 16(b) and concluding that "the District Court acted well within its discretion when it denied Eastern's motion to amend the complaint six months after the amendment and joinder deadlines had expired").

"'Good cause' under Rule 16(b) focuses on the diligence of the party seeking the modification of the scheduling order." *Price*, 737 F. Supp. 2d at 279; *see also* Fed. R. Civ. P. 16, advisory committee's note to 1983 amendment ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."). If the moving party "knows or is in possession of the information that forms the basis of the later motion to amend at the outset of the litigation, the party is presumptively not diligent." *Price*, 737 F. Supp. 2d at 280; *see also Adams v. Republic Servs., Inc.*, Civil No. 12-267-RMB-KMW, 2014 WL 12610152, at *2 (D.N.J. Sept. 16, 2014) ("Good cause may be lacking where a party had knowledge of a potential claim at the outset of the litigation [or] was

4

in possession of the information which formed the basis for the potential claim prior to the amendment deadline or where a party fails to seek an extension to the deadline."). "The presumption of non-diligence may be rebutted by a cogent explanation as to why the proposed amendment was not included in the original pleading." *Id.* However, "[c]arelessness, or attorney error, . . . is insufficient to constitute 'good cause' under Rule 16(b)." *Chancellor*, 501 F. Supp. 2d at 701–02.

III.

Richard argues that there is good cause for modifying the Scheduling Order because "it was not until reviewing discovery responses from Mildred and assembling relevant information related to discovery responses provided by Richard that Richard recognized the potential claim for contribution and/or indemnification against James and Sheila." (Doc. No. 18 at p. 6.) Richard has not identified with specificity which discovery responses, documents, or information alerted him to his potential claims against James and Sheila, asserting simply that the "documents produced by Mildred and interrogatory answers provided by Mildred highlight the involvement of James and Sheila."[1] (*Id.* at p. 9; *see also* Doc. No. 22 at p. 2.) Richard asserts that issues "related to COVID-19 forced both parties to require extra time to produce their documents and information in this matter," and therefore, "any short delay after the deadline set forth in the Scheduling Order is justifiable." (Doc. No. 18 at p. 6.)

Although the Court recognizes that in certain circumstances the difficulties caused by the COVID-19 pandemic could be sufficient to show good cause for amending a scheduling order, those circumstances are not present in this case. Richard has not shown that the pandemic has

---

[1] Even after Mildred identified this failure in her response brief, in his reply brief Richard failed to identify with specificity what new information he received during discovery that alerted him to his claims against James and Sheila. (*Compare* Doc. No. 19-1 at p. 4, *with* Doc. No. 22.)

5

any bearing on his request to add additional parties because he has not identified with specificity which new information he received during discovery alerted him to his claims against James and Sheila, nor has he explained how he was unable, with diligence, to find that information before the deadline in the Court's Scheduling Order. *See Arietta v. City of Allentown*, No. 04-CV-5306, 2006 WL 8459383, at *1 n.1 (E.D. Pa. June 19, 2006) ("Plaintiffs' vague allegation of receiving information from an unknown source does not provide a sufficient basis for extending the discovery deadline."); *see also Thomason v. Toyota Motor Eng'g & Mfg. N.A., Inc.*, Civ. A. No. 6:14-cv-04895-JMC, 2017 WL 10901214, at *2 (D.S.C. March 6, 2017) (explaining that the court had previously denied the plaintiff's motion to amend because "the Plaintiff's imprecise description of the [newly discovered] evidence left the court unable to determine whether the evidence could have been discovered with the exercise of reasonable diligence prior to the scheduling order's deadline or whether the proposed amendments, in fact, were based on such information").

In addition, the evidence presented by Mildred suggests that Richard knew the information needed to bring claims against James and Sheila before this litigation began. *See Chancellor*, 501 F. Supp. 2d at 702–03 (denying motion to amend because the defendant "knew of the facts which would support the amendment" when the complaint was filed and relying in part on the fact that the defendant had in its possession the "Plaintiff's school file, which listed" the relevant information); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000) (finding that the plaintiff received a copy of his employer's "leave policy, on which he now bases his contract claim, when he began work at the company" and that he was aware when he was terminated that he had "exhausted his maximum period of leave benefits," and therefore, he had "all the information necessary to support a breach of contract claim" when he filed the

complaint and "nothing he learned in discovery or otherwise altered that fact").

For one, Richard knew that Sheila was acting as a bookkeeper for the Cricket property and that she and James received and deposited checks related to the property, including reimbursement checks from Mildred to Richard. (*See* Doc. No. 19-3 (email from Sheila to Richard stating that "I deposited several checks for Cricket as well"); Doc. No. 19-4 (email from Richard to Sheila asking for financial information related to Cricket property); Doc. No. 19-5 (email from James to Richard stating that James would deposit a check from Mildred to Richard for "the final amount due for Cricket").) Richard also had access to bank statements for the account associated with the Cricket property — the account from which he alleges James and Sheila mismanaged money — and those statements showed not only the check deposits but also numerous ATM withdrawals. (*Compare* Doc. No. 1 at pp. 55–56 (copies of two checks written by Mildred and Morris to Richard) *with* Doc. No. 19-6 at p. 2 (reflecting deposit of both checks and multiple ATM withdrawals to the account, which is in Richard's name).)

Moreover, the evidence shows that before this litigation began, Richard not only possessed the relevant information, but in fact suspected that James and Sheila were mismanaging finances related to the Cricket property and other properties. In 2018, Richard sued James in a separate action before the Montgomery County Court of Common Pleas, alleging that James stole money from Richard's accounts via ATM cash withdrawals, and that James and Sheila mismanaged funds for accounts related to the Cricket property and two other Ardmore properties. (*See* Doc. No. 19-7 at ¶ 23 (stating that Richard "also believes [James] utilized monies for his personal benefit which were designated for use for improvements" at one Ardmore property); *id.* at ¶ 27 (describing allegedly "bizarre conduct" by James and unexplained cash withdrawals out of an account for the second Ardmore property).) In the state court

complaint, Richard alleged that Mildred and Morris paid James for "his 'work' renovating the Cricket Property," and that James and Sheila's bookkeeping wrongfully "comingled funds among [the two Ardmore properties] and the Cricket property, to [their] personal advantage." (Doc. No. 19 at ¶¶ 36, 52.)  Richard also alleged that James and Sheila "took out repeated undocumented and undisclosed loans from [Mildred] for what [James] later characterized as 'expenditures' on the Ardmore Properties and the Cricket property, although he had no authorization or authority to do so and produced no receipts for any such expenditures." (Doc. No. 19 at ¶ 53.)

      Last, on February 5, 2020, during his deposition in the Montgomery County case, Richard testified that after his retirement, he became aware of the allegedly undocumented loans related to the Cricket property and "started looking at historical financials."  He also testified that he believed James and Sheila "had their hands in the till and they were pulling my money and they weren't spending it the way they were supposed to spend it.  They were spending it either for themselves or their mother's house improvements or John's apartment in Cricket or something."  (Doc. No. 19 at p. 163:14–19; Doc. No. 22 at p. 2 (admitting that during his deposition, Richard "identified all of Sheila's financial statements," including summary statements for the Cricket property, as "questionable"); *see also* Doc. No. 19-8 at p. 162:13–16 (characterizing as fraudulent, "every one of these financials" because "they all reflect the fact that funds were taken and they were not applied to the[ ] projects").)

      Without a more specific description of the new information revealed during discovery, and in light of this evidence showing that Richard "possessed the relevant knowledge" before the deadline for adding additional parties, this Court cannot find that Richard was diligent in filing his motion or that he has carried his burden of demonstrating good cause for altering the

deadlines in the Court's Scheduling Order.[2] *See Price*, 737 F. Supp. 2d at 280 ("Because Plaintiff possessed the relevant knowledge regarding" the allegedly new facts "before the amended pleadings were due, and has not proposed a clear and cognizable justification for the eight-month delay beyond the deadline set forth in the Schedule Order, under Rule 16(b), Plaintiff has failed to show 'good cause' to allow the amendment."); *see also Chancellor*, 501 F. Supp. 2d at 702–03 (denying the defendant's motion to amend because it "possessed the relevant knowledge on which to base a statute of limitations affirmative defense at the outset of the litigation and has not proposed a cognizable justification for the five-month delay beyond the time set forth in the scheduling order").[3]

IV.

Because Richard has not demonstrated good cause for altering the Scheduling Order, his motion for leave to file an amended answer and third party complaint to add additional parties will be denied.  An appropriate order follows.

---

[2] Although this result may seem harsh, the Court reminds the parties that scheduling orders are issued "in each case as a roadmap to reaching the merits of a claim in a crowded docket." *In re Asbestos Prods Liab. Litig.*, 278 F.R.D. 126, 130 (E.D. Pa. 2011).  When a party "fails to comply with the Court's roadmap without justification, as in this case, not only will the Court not reach the merits in a timely fashion, but the progress of other cases waiting in the queue will be delayed." *Id.*

[3] Because the Court finds that Richard has not carried his burden under Rule 16, we do not address the parties' specific arguments for and against amendment under Rule 15.